The Honorable Karen A. Overstreet
Chapter 11

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| In re | Case No. 09-20780-KAO |
|---|---|
| THE CASCADIA PROJECT LLC,<br>EIN: 20-4188863<br><br>Debtor. | DISCLOSURE STATEMENT IN SUPPORT OF SECOND AMENDED PLAN OF REORGANIZATION PROPOSED BY THE CASCADIA PROJECT LLC |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON 98101-2352

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION AND SUMMARY OF PLAN ................................................1

     A.   INTRODUCTION ...........................................................................1

     B.   BRIEF PLAN SUMMARY ..............................................................2

     C.   BRIEF EXPLANATION OF CHAPTER 11 ......................................8

II.  VOTING ............................................................................................9

     A.   BALLOTS AND VOTING DEADLINE ...........................................9

     B.   PARTIES ENTITLED TO VOTE .................................................10

III. BACKGROUND AND GENERAL INFORMATION...............................10

     A.   PROCEDURAL STATUS OF THIS CASE .....................................10

     B.   CASCADIA'S HISTORY ............................................................10

     C.   MATERIAL POSTPETITION EVENTS .......................................13

     D.   CASCADIA'S ASSETS ..............................................................19

     E.   CASCADIA'S LIABILITIES .......................................................20

IV.  DESCRIPTION OF PLAN OF REORGANIZATION ............................20

     A.   CASH-FLOW PROJECTION .......................................................20

     B.   TREATMENT OF UNCLASSIFIED CLAIMS ...............................23

     C.   ESTATE CLAIMS ....................................................................24

     D.   CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS ............24

     E.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES .........................31

     F.   CONFIRMATION EFFECT ........................................................31

V.   TAX CONSEQUENCES .......................................................................32

VI.  RISKS AND ALTERNATIVES ............................................................32

     A.   RISKS ...................................................................................32

     B.   ALTERNATIVES ......................................................................33

VII. CONCLUSION .................................................................................35

**MILLER NASH LLP**
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON  98101-2352

SEADOCS:420153.12
552640.0004

I.      **INTRODUCTION AND SUMMARY OF PLAN**

     A.      **INTRODUCTION**

On October 15, 2009, The Cascadia Project LLC, a Washington limited liability company ("Cascadia"), filed in this court a voluntary petition initiating a chapter 11 business reorganization case under the United States Bankruptcy Code. The court has not appointed a trustee in this case, and Cascadia is a "debtor in possession."

On July 2, 2010, Cascadia filed its second amended proposed plan of reorganization dated July 2, 2010, and Cascadia has provided a copy of the plan with this disclosure statement. With few exceptions, creditors and investors will have the opportunity to vote to accept or reject the plan, and the court will consider votes in determining whether to confirm the plan. The purpose of this disclosure statement is to give creditors and investors sufficient information to decide whether to vote to accept or reject the plan, and Cascadia urges all creditors and investors to carefully review this entire disclosure statement and the plan and consult with your legal and tax advisors before determining whether to vote to accept or reject the plan. For the reasons set forth below, Cascadia believes that **confirmation of the plan would best serve the interests of all creditors and investors, and Cascadia accordingly urges all creditors and investors to vote to accept the plan**. Cascadia discusses the deadline and procedures applicable to voting on the plan in Part II below.

Cascadia has prepared this disclosure statement based on information contained in Cascadia's schedules of assets and liabilities, its books and records, and other information sources discussed below. The statements in this disclosure statement are as of the date hereof, unless this disclosure statement specifies another time. Cascadia's delivery of this disclosure statement does not imply that there has been no change in the facts set forth herein since the date hereof or the date Cascadia compiled the material on which it relied in preparing this disclosure statement. The description of the plan in this disclosure statement is only a

**MILLER NASH** LLP
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON 98101-2352

SEADOCS:420153.12
552640.0004

1   summary, qualified in its entirety by reference to the plan itself.  In case of any inconsistency

2   between the plan and this disclosure statement, the plan controls.  No one may rely on this

3   disclosure statement for any purpose other than to determine how to vote on the plan.  Nothing

4   in this disclosure statement is an admission of any fact or liability, admissible in any

5   proceeding involving Cascadia, or advice on the tax or other legal effects of the plan on the

6   holders of claims or interests.

7         The court has scheduled a hearing on confirmation of the plan for July __, 2010,

8   at __ a.m.  The court will hold the hearing in the United States Courthouse, Room 7206,

9   700 Stewart Street, Seattle, Washington, before Judge Karen A. Overstreet.  The court may

10   adjourn the hearing from time to time without further notice, except for an announcement made

11   at the hearing or any adjournment thereof.

12        **B.**     **BRIEF PLAN SUMMARY**

13         Cascadia's LLC member is Patrick Kuo.  Cascadia owns approximately 4,200

14   acres of land, with various zoning classifications and development permits, in Pierce County,

15   Washington.  Cascadia is developing the land as an employment-based community (the "Project").

16         Under the plan, three new investors, TPG Opportunities Partners, L.P. ("TPG"),

17   Yarrow Bay Holdings ("YB"), and OFG Cascadia, LLC ("OFG"), will form a new entity,

18   referred to herein as "Holdings," which will in turn become Cascadia's LLC member.  Two of

19   the three investors will form a second new entity, referred to herein as the "Servicing Entity,"

20   which will manage Cascadia on a cost reimbursement basis controlled by TPG.  The three new

21   investors will contribute capital to Holdings of $55 million, of which they will contribute

22   $31 million on or after the Effective Date or the date the case is closed, and at least $10 million

23   within the two years following the Effective Date.  The new investors' funding, together with

24   Cascadia's property sales and other development activity, will fund Cascadia's operating capital

25   and ability to make creditor payments.  Cascadia will continue to develop the Project as an

26   employment-based community.

DISCLOSURE STATEMENT IN SUPPORT OF SECOND AMENDED PLAN OF
REORGANIZATION PROPOSED BY THE CASCADIA PROJECT LLC - 2

**MILLER NASH** LLP
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON  98101-2352

The following table summarizes the plan's treatment of classes of creditor claims and investor interests:

| Class | Description | Estimated Aggregate Amount | Class Treatment | Class Status: Voting Rights | Estimated Percentage Recovery |
|---|---|---|---|---|---|
| 1 | Convenience Unsecured Claims | $77.663.48 | Paid in full without interest by the later of the 30th day after the Effective Date or the date the court enters its Final Order determining the Claim | Impaired, entitled to vote | 100% |
| 2 | Unsecured Claims other than those in Class 1 or that of Cascadia Land, LLC | $2,131,928.65 | Cascadia will pay the lesser of all Allowed Class 2 claims or $2,131,928.65 ratably in 20 equal quarterly payments without interest. Cascadia will also pay holders of Class 2 Claims ratably any net proceeds of Cascadia's pursuit of avoidance or recovery actions under Bankruptcy Code chapter 5 and its claim against HomeStreet arising from HomeStreet's attorney's June 11, 2010, letter to Cascadia's attorneys, and Cascadia will also pay holders of Class 2 Claims ratably from any OFG Redirection Payments as described the Summary of Class 3 Treatment, below, but only to the extent of the lesser of all Allowed Class 2 claims or $2,131,928.65, calculated by adding the 20 equal quarterly payments with the OFG redirection payments. | Impaired, entitled to vote | 100% unless HomeStreet elects Option 2 under Class 3, in which case 5%. Also, if the court allows Centex/ Pulte Homes' claim, and HomeStreet does not elect Option 2 under Class 3, the distribution would be 57%. |
| 3 | HomeStreet | $74,166,779 | General treatment. Cascadia will pay to HomeStreet Cascadia's deposits at Commerce Bank, approximately $350,000. Before Cascadia makes any distribution of excess cash as defined in the Letter of Intent (Exhibit A), Cascadia must certify to HomeStreet that, at the time of and after giving effect to the distribution, and not considering any obligation to | Impaired; entitled to vote | 100% under Options 1 and 3 and 64% under Option 2 |

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON 98101-2352

| Class | Description | Estimated Aggregate Amount | Class Treatment | Class Status: Voting Rights | Estimated Percentage Recovery |
|---|---|---|---|---|---|
| | | | Cascadia Land, LLC or contingent obligations to the servicing entity, Cascadia will retain assets worth 110 percent of the amount required to comply with RCW 25.15.235.  Until all payments required under the plan to HomeStreet and unsecured creditors (other than Contingent Noteholder) have been made:  (i) Holdings will redirect any amount otherwise payable as a distribution to OFG by Holdings, and (ii) servicing entity as defined in the Letter of Intent will redirect any amount of any contingent service fee  as defined in the Letter of Intent otherwise distributable to OFG by servicing entity.  The amounts redirected by Holdings and servicing entity pursuant to this paragraph (the "OFG Redirection Payments") will be paid first to HomeStreet for application to Cascadia's indebtedness until paid in full as provided in the plan, and then to unsecured creditors (other than Cascadia Land, LLC) until their claims have been paid as provided in the plan.  Nothing in this paragraph requires redirection by servicing entity of any portion of the monthly fee paid or distributed to OFG or amounts paid to OFG as reimbursement for costs incurred.  OFG will be deemed subrogated to the rights of HomeStreet and the unsecured creditors to the extent of the OFG Redirection Payments.  Cascadia will pay OFG its subrogation claim in the same manner Cascadia would have paid HomeStreet and the unsecured creditors but for the OFG Redirection Payments.  OFG's subrogation claim arising from the OFG Redirection | | |

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON  98101-2352

| Class | Description | Estimated Aggregate Amount | Class Treatment | Class Status: Voting Rights | Estimated Percentage Recovery |
|---|---|---|---|---|---|
| | | | Payments will have priority over any other subrogation claims. Cascadia will also treat HomeStreet under one of Options 1-3 elected by HomeStreet. Option 1 is the default option if HomeStreet does not elect an option. In no event will the payments to HomeStreet exceed the amounts provided in Options 1, 2 or 3 as the case may be. | | |
| | | | Option 1. Under Option 1, Class 3 consists of both the Class 3 Allowed Secured Claim and the Class 3 Allowed Unsecured Claim, and HomeStreet will have no Class 2 Claim. By the 10th Day after the court closes this case, Holdings will pledge to HomeStreet a deposit account at another financial institution or other liquid assets worth $15 million (the "Road Reserve") as additional collateral that Home Street may apply if Home Street becomes entitled to exercise its default remedies. If HomeStreet elects treatment under Bankruptcy Code § 1111(b), then on the 84th month after the effective date, Cascadia would also pay HomeStreet the greater of (a) the unpaid portion of the secured claim (equal to the value of the collateral), plus interest, or (b) any amount by which the amount of the entire claim exceeds the sum of all payments from the Effective Date. If HomeStreet does not make the section 1111(b) election, then Cascadia would make monthly payments amortizing the secured claim with interest over 25 years and make equal payments of 1/300th of the amount of the unsecured claim, and it would pay the balance of both | | |

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON 98101-2352

SEADOCS:420153.12
552640.0004

| Class | Description | Estimated Aggregate Amount | Class Treatment | Class Status: Voting Rights | Estimated Percentage Recovery |
|---|---|---|---|---|---|
| | | | claims by on the first day of the 84th month that begins after the Effective Date. Option 2. Under Option 2, Class 3 would consist only of HomeStreet's secured claim. Cascadia would pay monthly payments determined by amortizing the secured claim over 25 years, with interest at the prime rate plus 200 basis points. At the end of the year 7, Cascadia would pay HomeStreet the balance of the secured claim, plus interest. Cascadia would treat HomeStreet's unsecured claim in Class 2. By the 10th day after the court closes this case, Holdings will pledge to HomeStreet a deposit account at another financial institution or other liquid assets worth $15 million (the "Road Reserve") as additional collateral if Home Street becomes entitled to exercise its default remedies. Option 3. Under Option 3, Class 3 would treat both HomeStreet's secured claim and its unsecured claim. In addition to the General Treatment, Cascadia would pay HomeStreet $10 million to reduce the secured claim and provide a $4 million interest reserve for 36 months. During years 1-5, Cascadia would pay monthly interest payments calculated at prime +2% on the unpaid balance of HomeStreet's claim. Beginning in year 6, Cascadia will pay HomeStreet an amount determined by amortizing over 20 years HomeStreet's secured claim, and will make monthly payments of 1/240th of the unsecured claim. At the end of year 9, Cascadia would | | |

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON 98101-2352

SEADOCS:420153.12
552640.0004

| Class | Description | Estimated Aggregate Amount | Class Treatment | Class Status: Voting Rights | Estimated Percentage Recovery |
|---|---|---|---|---|---|
| | | | pay the balance of the secured claim, with interest, and the balance of the unsecured claim, without interest. Cascadia would transfer to Holdings free and clear of all liens, ownership of parcels K1, K2, L, L1, M1 and M5 of the project and Cascadia's membership interest in Cascadia Resort Communities, LLC. HomeStreet must accept the plan and agree not to appeal its confirmation. Other provisions regarding Cascadia's augmentation and use of HomeStreet's collateral in each of the three options appears in plan Section 4.3. | | |
| 4 | City of Tacoma | Claim A: $1,118,000 Claim B: $85,722.74 | Cascadia will pay Claim 4A, the Secured Claim, pursuant to contract, except that the commencement dates for interest and principal payments (due if Cascadia fails to reach customer number targets) will each be deferred one year. Cascadia will pay Claim 4B, the Unsecured Claim, in full 60 days after the Effective Date. | Impaired; entitled to vote | 100% |
| 5 | Kuo's claim based on payment to HomeStreet | $1,000,000 | Paid in full without interest out of cash flow after defined prior plan payments and before payments to Cascadia Land, LLC but after the senior subrogation payments of OFG. | Impaired; entitled to vote | 100% |
| 6 | Kuo's interest in Cascadia | $0 | Cancelled. Kuo will receive nothing on account of his interest. | Impaired; entitled to vote | 0% |
| 7 | Cascadia Land, LLC | $3,515,933 (minimum amount; actual amount not yet | Lesser of $16.2 million or the amount Cascadia Land, LLC, has invested in Cascadia or its predecessors before the Filing Date, without interest or any other return, in either case less | Impaired; entitled to vote | 100% |

DISCLOSURE STATEMENT IN SUPPORT OF SECOND AMENDED PLAN OF REORGANIZATION PROPOSED BY THE CASCADIA PROJECT LLC - 7

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON 98101-2352

SEADOCS:420153.12
552640.0004

| Class | Description | Estimated Aggregate Amount | Class Treatment | Class Status: Voting Rights | Estimated Percentage Recovery |
|---|---|---|---|---|---|
| | | determined) | any cash received by Cascadia Land, LLC, from Cascadia or its predecessors, with payments made after plan payments to HomeStreet and certain defined plan payments have been completed, and after the OFG subrogation claim and then the payment of the Kuo subrogation claim. | | |

Cascadia has attached hereto a table, marked as Exhibit B, explaining the effect on each plan class of each of the three plan options available to HomeStreet Bank, discussed in Part IV.D.3 below.

If any class does not accept the plan, Cascadia will request that the court nonetheless confirm the plan.

## C.     BRIEF EXPLANATION OF CHAPTER 11

Chapter 11 of the Bankruptcy Code is the principal reorganization provision of the Bankruptcy Code.  In a chapter 11 reorganization case, a debtor in possession (such as Cascadia in this case), chapter 11 trustee, or other party in interest attempts to reorganize Cascadia's business for the benefit of Cascadia, its creditors, and other parties in interest.  The formulation and confirmation of a plan of reorganization is the principal purpose of a chapter 11 case.  A plan sets forth a proposed method for compensating the creditors and holders of equity interests in Cascadia.  A claim or interest is impaired under a plan if the plan alters the legal, equitable, or contractual rights of the holder of the claim or interest.  A holder of an impaired claim or interest is entitled to vote to accept or reject the plan.  If a plan meets certain requirements, the court may confirm it even if fewer than all creditors and holders of equity interests accept the plan.

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON  98101-2352

1    **II.    VOTING**

2          **A.    BALLOTS AND VOTING DEADLINE**

3                Cascadia has enclosed a ballot for voting to accept or reject the plan with each

4    copy of this disclosure statement Cascadia mails to creditors entitled to vote.  After carefully

5    reviewing this disclosure statement and its exhibits, including the plan, please indicate your

6    acceptance or rejection of the plan by voting to accept or reject the plan on the enclosed ballot

7    as directed below.

8                Each creditor that has filed a proof of claim or that otherwise holds an Allowed

9    Claim may vote based on the amount of the proof of claim or the amount of the Allowed Claim

10   unless the court has entered an order denying the claim or reducing the amount of the claim.  If

11   a creditor has not filed a proof of claim, then the amount of its claim for voting purposes will be

12   the amount Cascadia listed for the claim in its liabilities schedules.  If a creditor holds claims in

13   more than one class entitled to vote on the plan, the creditor may complete and return a ballot

14   for each class.  If you do not receive a ballot or if you receive a damaged ballot or lose your

15   ballot, please contact:

16                      Miller Nash LLP
                        Attn:  Geoffrey Groshong
17                      4400 Two Union Square
                        601 Union Street
18                      Seattle, WA 98101-2352
                        Tel:  (206) 777-7419
19                      geoff.groshong@millernash.com

20                To cast your vote to accept or reject the plan, complete, date, and sign the ballot

21   accompanying this disclosure statement and return it by mail or hand delivery to Cascadia's

22   attorney at the address indicated above.  Cascadia will not count a ballot unless its attorney

23   receives an executed ballot at the above address no later than 4:00 p.m. Pacific Daylight Time

24   on July __, 2010.  Cascadia will not consider any late or unsigned ballots or ballots sent to its

25   attorney by fax or e-mail.  If a creditor signs and returns a ballot but does not indicate on the

26

DISCLOSURE STATEMENT IN SUPPORT OF SECOND AMENDED PLAN OF
REORGANIZATION PROPOSED BY THE CASCADIA PROJECT LLC - 9

**MILLER NASH LLP**
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON  98101-2352

SEADOCS:420153.12
552640.0004

1 ballot whether the creditor accepts or rejects the plan, Cascadia will treat the ballot as a vote to

2 accept the plan.

3 **B.    PARTIES ENTITLED TO VOTE**

4 Each class of impaired claims or interests that will receive something under the

5 plan may vote to accept or reject the plan.  A class can be unimpaired in two ways.  First, a

6 class is unimpaired if the plan leaves unaltered the legal, equitable, and contractual rights of the

7 holders of claims in that class.  Second, a class is unimpaired if the plan provides for (1) curing

8 any defaults, (2) reinstating the claim's maturity, (3) compensating the claim holder for

9 damages resulting from reasonable reliance on any contractual provision of law that allows

10 claim acceleration, and (4) otherwise leaving unaltered any legal, equitable, or contractual right

11 to which the claim entitles the holder.  Because of their favorable treatment, the law treats

12 unimpaired classes as having accepted the plan.  Accordingly, it is not necessary to solicit votes

13 from the holders of claims in classes that are not impaired.

14 The law treats classes of claims or interests that will not receive or retain any

15 money or property under a plan as having rejected the plan, so those classes do not vote.  In the

16 plan, all classified claims are impaired.

17 **III.    BACKGROUND AND GENERAL INFORMATION**

18 **A.    PROCEDURAL STATUS OF THIS CASE**

19 Cascadia commenced this case by filing its petition on October 15, 2009 (the

20 "Petition Date").  Cascadia has retained control over its assets, and continues to operate its

21 business pursuant to 11 U.S.C. §§ 1107 and 1108.

22 **B.    CASCADIA'S HISTORY**

23 Cascadia's primary business operation is the development of approximately

24 4,200 acres of land near Orting and Bonney Lake, Washington (the "Land"), as an

25 employment-based planned community, including the planned development of residential,

26 commercial, business and educational properties.  Cascadia, through contractors, also conducts

DISCLOSURE STATEMENT IN SUPPORT OF SECOND AMENDED PLAN OF
REORGANIZATION PROPOSED BY THE CASCADIA PROJECT LLC - 10

**MILLER NASH LLP**
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON  98101-2352

SEADOCS:420153.12
552640.0004

1   timber harvesting on the Land and on adjoining property owned by Cascadia Resort

2   Communities LLC ("CRC").  In 1991, a wholly owned subsidiary of a Bahamian corporation

3   owned by a group of Taiwan investors bought the Land.  Cascadia was formed in 1999 as a

4   Washington limited liability company whose current sole member and manager is Mr. Kuo.

5   Cascadia took title to the Land in 2006.  Mr. Kuo has been significantly involved in the project

6   from its inception and continues his significant involvement as manager and sole member of

7   Cascadia.

8          Cascadia has completed significant infrastructure improvements, including

9   underground utilities, sewer and water installation, road and sidewalk construction, trails,

10  parks, and the preparation of 389 finished residential lots as well as one super pad that Cascade

11  will develop into an additional 113 lots.

12         There is one permanent aboveground structure on the property.  In 2009, the

13  Sumner School District built "Elementary School Number 9" for approximately $18 million.

14  The district currently uses the school for approximately 600 students and the accompanying

15  faculty and staff.  There is one partially finished structure on the site (currently foundation

16  only), which will be the community's informational center, and there is an interim fenced trailer

17  complex that is currently used as the site office.

18         In addition to its real property, Cascadia has a 50-percent membership interest in

19  CRC, which owns an adjoining 514-acre parcel that has been under initial development as a

20  golf course resort community.  The other 50-percent member of CRC is Sumitomo Forestry

21  Seattle, Inc., a Washington corporation.  Cascadia is the manager of CRC.  The golf course

22  itself has been cleared and rough graded.  Cascadia estimates the value of its 50-percent interest

23  in CRC to exceed $9 million if the remainder of the Project is successful; but without

24  successful development of the remainder of the Project, the value of the 50-percent interest in

25  CRC is uncertain.  Shortly before the Petition Date, Cascadia granted a security interest in its

26

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON  98101-2352

1      CRC member interest to Mr. Y.K. Chen, Mr. Kuo's father in law, to secure prior and future

2      advances not to exceed $1,500,000.

3             In 2006, Cascadia received approximately $2,600,000 in earnest money

4      payments from two national builders and one regional builder for the purchase of 389 finished

5      residential lots, at a combined price of approximately $52 million, and $250,000 in option

6      payments for additional lots.  In 2008, after Cascadia completed its responsibilities under the

7      sales contracts, each of the three builders declined to complete their purchases of the lots,

8      forfeiting their earnest money and option payments.  One of these builders, Centex/Pulte

9      Homes, has filed a proof of claim alleging it is entitled to a refund of its earnest money deposit

10     in the approximate amount of $1,800,000.  Cascadia filed an objection to the claim, and the

11     matter will be litigated.  Cascadia may assert an affirmative claim based on fraud and

12     misrepresentation in connection with the litigation..  These events significantly impaired

13     Cascadia's cash flow.  An earlier event also caused significant damage to Cascadia and

14     impeded Cascadia's ability to close sales on the finished lots at a much earlier date.  In 2006,

15     after a nationwide search, Cascadia signed a contract with Michels Corporation to drill a tunnel

16     under the Carbon River and install pipes in that tunnel connecting to the waste water treatment

17     facility operated by the City of Orting on property adjoining the Land.  In December 2006, the

18     tunnel collapsed, delaying Cascadia's development of its project by at least one year and

19     causing significant other damages to Cascadia.

20            Cascadia's primary lender is HomeStreet Bank ("HomeStreet").  HomeStreet has

21     made two loans to Cascadia:  an infrastructure loan with a balance of approximately

22     $37,659,948.88 that is secured by a deed of trust recorded on June 29, 2005, as amended (the

23     "First Deed of Trust"), and an acquisition and development loan with a balance of

24     approximately $35,189,590.86 that is secured by a deed of trust recorded on August 30, 2007

25     (the "Second Deed of Trust").  HomeStreet subordinated the First Deed of Trust to the Second

26     Deed of Trust.  In addition, certain lien claims held by contractors are junior in priority to the

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON  98101-2352

SEADOCS:420153.12
552640.0004

1  First Deed of Trust.  The amounts of the HomeStreet loan balances listed in Cascadia's

2  schedules are as stated in two Notices of Trustee's Sales recorded in Pierce County,

3  Washington, on July 9, 2009.  Cascadia has not verified the amounts of the HomeStreet claims

4  and the claims are subject to valuation of the collateral securing the claims.

5       In 2009, HomeStreet commenced nonjudicial deed of trust foreclosures on both

6  of the loans.  Cascadia's attempts to negotiate a forbearance agreement were not successful.

7  HomeStreet scheduled the sales for October 16, 2009.  On October 15, 2009, Cascadia filed its

8  petition to stay the sales and attempt to reorganize and recapitalize its operations and emerge

9  from bankruptcy.

10      **C.      MATERIAL POSTPETITION EVENTS**

11           1.    Bankruptcy Court disputes with HomeStreet

12      On December 18, 2009, the court entered its order granting HomeStreet's motion

13  for an order determining that the Project constituted "single asset real estate" under the

14  Bankruptcy Code [Dkt. #120].  That determination required Cascadia to make certain payments

15  to HomeStreet, even before confirmation of a plan.

16      On December 23, 2009, the court set the amount of Cascadia's monthly payment

17  to HomeStreet pursuant to 11 U.S.C. § 362(d)(3)(B) at $266,057.  [Dkt. #128].  In February

18  2010, Cascadia commenced payments under 11 U.S.C. § 362(d)(3)(B).  If the court confirms

19  the plan by August 5, 2010, Cascadia will have made postpetition payments to HomeStreet

20  totaling $1,596,342.

21      On December 18, 2009, HomeStreet filed a motion for relief from the automatic

22  stay [Dkt. #121] and HomeStreet later filed an additional motion for relief from the automatic

23  stay [Dkt. #299] (together, the "Relief From Stay Motion").  Initially, the court scheduled the

24  evidentiary hearings on plan confirmation and the final hearing on the Relief from Stay Motion

25  for June 22 through 24, 2010 [Dkt. #187].  On April 14, 2010, however, the court granted

26  Cascadia additional time to file its plan and disclosure statement [Dkt. #260].  The court gave

DISCLOSURE STATEMENT IN SUPPORT OF SECOND AMENDED PLAN OF
REORGANIZATION PROPOSED BY THE CASCADIA PROJECT LLC - 13

**MILLER NASH LLP**
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON  98101-2352

SEADOCS:420153.12
552640.0004

1   Cascadia until May 31, 2010, to file its plan and disclosure statement, with the date for hearing

2   on each to be set by the court after they were filed.  Cascadia filed its original proposed plan

3   and disclosure statement on May 31, 2010.  It then filed its first amended plan and disclosure

4   statement in support thereof on June 19, 2010, and June 21, 2010, respectively.  On June 30,

5   2010, after hearings on June 22, 23, and 24, 2010, the Court issued an Order on Motions for

6   Relief from the Automatic Stay Filed by HomeStreet Bank [Dkt. #493], denying HomeStreet's

7   Relief From Stay Motion without prejudice.

8                 2.      <u>Cascadia's engagement of Obsidian Finance Group, LLC</u>

9           On January 28, 2010, the court approved Cascadia's employment of Obsidian

10   Finance Group, LLC ("Obsidian"), as Cascadia's financial advisor in this case [Dkt. #91, 188].

11   Obsidian is a Portland, Oregon based hybrid advisory and investment group.  It specializes in

12   unique and difficult business situations, including distressed enterprises and assets.  Obsidian's

13   personnel have expertise in law, real estate, public accounting, investment banking, finance,

14   tax, and bankruptcy.  Obsidian's professionals have significant problem asset resolution

15   expertise, including servicing of assets in bankruptcy and after reorganization.  Obsidian's

16   investments include development property in the Puget Sound region and real estate in other

17   areas of the Pacific Northwest.

18                  3.      <u>Proposed acquisition by new investors</u>

19           Cascadia has entered into a comprehensive letter of intent with TPG, YB, and

20   Obsidian dated May 28, 2010 (the "Letter of Intent").  The Letter of Intent is non-binding;

21   however, the parties anticipate that the parties will execute definitive binding documentation

22   before the confirmation hearing.  The definitive documents will be consistent with the Letter of

23   Intent, except that, given Cascadia's belief that HomeStreet will not choose treatment under

24   Option 3, the pay down of $10 million and the interest reserve of $4 million will not be

25   required.  The Letter of Intent contemplates a total new equity investment of $55 million, with

26   approximately $31 million of that amount being invested by the end of 2010 and a minimum of

**MILLER NASH** LLP
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON  98101-2352

1  an additional $10 million invested within two years of the Effective Date.  On July 1, 2010,

2  Cascadia received a letter from TPG acknowledging the filing of the first amended plan

3  (Exhibit 2 to the plan).

4  TPG is an investment fund affiliate of TPG Capital (formerly Texas Pacific

5  Group), one of the largest private equity investment firms globally, focused on leveraged

6  buyout, growth capital, and leveraged recapitalization investments in distressed companies and

7  turnaround situations.  TPG Capital also manages investment funds specializing in growth

8  capital, venture capital, public equity, and debt investments.

9  YB is owned by Brian Ross and others.  Yarrow Bay has extensive experience

10  with master planned communities in the Seattle-Tacoma-Bellevue Metropolitan Statistical

11  Area.  Mr. Ross, Chief Executive Officer of Yarrow Bay, is well experienced in the land and

12  project development process, including having experience as a custom homebuilder.  Before

13  founding Yarrow Bay, Mr. Ross directed land acquisition and subsequent development for a

14  prominent Eastside Seattle firm.  David MacDuff, Chief Operating Officer of Yarrow Bay, has

15  20 years of experience specializing in land acquisition, finance development, and sales.  His

16  recent experience includes being the project manager for Intracorp Seattle on its Talus master

17  planned community.  He directed all facets of the project from concept development, through

18  design/engineering/permitting, construction, and sale to builders.  Additionally, Yarrow Bay's

19  well-qualified staff includes real estate professionals, an engineer, an experienced landscape

20  architect, individuals with public planning experience, and finance professionals.

21  The $55 million equity investment is greater than was anticipated at the

22  beginning of the search for new equity investors.  The increase is attributable to two primary

23  factors.  First, in the plan's Option 3 for treatment of HomeStreet's claim, Cascadia has created

24  treatment for HomeStreet's claim that would contain an immediate $10 million paydown of

25  HomeStreet's claim and provide a $4 million additional collateral reserve for HomeStreet for

26  three years.  Second, to increase significantly the value of the Project and to provide the highest

DISCLOSURE STATEMENT IN SUPPORT OF SECOND AMENDED PLAN OF
REORGANIZATION PROPOSED BY THE CASCADIA PROJECT LLC - 15

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON  98101-2352

SEADOCS:420153.12
552640.0004

1   likelihood of success, it was necessary to ensure that access (commonly called the 198th street

2   corridor) to the Project be developed at the earliest possible date.  The equity increase was

3   approximately $25 million more than the $30 million that would otherwise have been required,

4   and the 2010 equity commitment was correspondingly increased by that amount together with

5   the $4 million additional collateral ($29 million more equity required in 2010).  Since the filing

6   of the Cascadia's original plan on May 31, 2010 [Dkt. #333], HomeStreet has given an

7   indication that it is unlikely to choose Option 3.  There is a lesser need for up front cash if

8   HomeStreet does not chose Option 3, but this does not reduce the total funds commitment of

9   new equity.

10          In the opinion of Cascadia and its advisors, it was necessary to obtain additional

11   equity to make the Project viable.  A plan proposing a restructuring of the HomeStreet claim

12   without the additional equity raise may not have been confirmable under the Bankruptcy Code,

13   and in any event, it would have reduced the viability of the Project.  Prospective investors

14   informed Cascadia that in their view HomeStreet was significantly undersecured and they

15   would not invest new equity without a significant reduction of the HomeStreet claim.  Cascadia

16   and its advisors sought equity investors that would recognize that the restructuring of the

17   HomeStreet claim together with the new equity infusion would be sufficient to allow the equity

18   investors to realize appropriate returns reflecting the risk.  Ultimately, only TPG and Yarrow

19   Bay were prepared to execute the Letter of Intent providing for the significant equity infusion

20   and the option (as provided in the plan) for HomeStreet to realize repayment of substantially all

21   of its Claim.

22          TPG required the participation of Obsidian as an investor for two reasons.  First,

23   Obsidian has completed a substantial amount of diligence and modeling, and TPG wanted

24   Obsidian to "put its money where its mouth is."  TPG considered this even more important

25   because TPG was not brought into the final process until recently, and it was necessary for

26   TPG to be comfortable that Obsidian was prepared to take some of the equity risk to which

DISCLOSURE STATEMENT IN SUPPORT OF SECOND AMENDED PLAN OF
REORGANIZATION PROPOSED BY THE CASCADIA PROJECT LLC - 16

**MILLER NASH** LLP
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON  98101-2352

SEADOCS:420153.12
552640.0004

1  TPG was being asked to commit.  Second, it was Obsidian's contacts with TPG that allowed

2  TPG to move quickly in the reviewing the investment.  (Neither TPG nor Obsidian is an

3  affiliate of the other.)  TPG requires that Obsidian play a significant role after plan

4  confirmation so that TPG's investment has the highest likelihood of success.  Obsidian has

5  formed a wholly owned subsidiary, OFG, which would hold the Cascadia investment.

6          After confirmation, there will be a holding company, Holdings, controlled by

7  TPG, which will control Cascadia.  The day-to-day servicing of the investment and Project will

8  be controlled by a servicing company controlled by YB and in which OFG is anticipated to

9  play a significant role.  The servicing entity's relationship with the Project may be terminated

10  by Cascadia (which as stated above is effectively controlled by TPG) for cause, and the

11  servicing entity will reimburse OFG and YB for costs only on account of their services.

12          Mr. Kuo is anticipated to play an important role as the "founder," but he will not

13  have an ownership interest in Holdings.  Mr. Kuo will have a three-year contract with a per

14  annum compensation of $150,000.  From that amount, he will pay interest on the $1 million

15  that he borrowed to cash collateralize a $1 million letter of credit in favor of HomeStreet and

16  upon which HomeStreet drew.  Mr. Kuo will receive incentive compensation if his efforts are

17  accretive to the current projections.  It is unknown how much additional compensation could be

18  provided because such compensation will depend upon his performance.  Over the life of the

19  Project, Cascadia projects that incentive compensation for Mr. Kuo and others will be

20  $22 million, but the actual amount could be significantly greater or significantly less depending

21  on performance, the outcome of the Project, the early sale of parcels, and/or the bulk sale of the

22  remaining land.

23          Cascadia will cancel Mr. Kuo's interest, and he will receive nothing for it.

24          4.    <u>Committee's Review of Obsidian's Work</u>.

25          Cascadia has included the following three paragraphs in this statement with the

26  authorization of the Official Committee of Unsecured Creditors (the "Committee").

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON  98101-2352

1　　　　On June 3, 2010, three days after the May 31, 2010, filing of Cascadia's original

2　proposed disclosure statement and plan, counsel for the Committee met with Kevin Padrick of

3　Obsidian at the offices of the Committee's legal counsel.  Anticipating concerns with regards to

4　Obsidian's role under the plan, given that the court-appointed financial advisor was now a

5　proposed investor under the plan, the purpose of meeting was for Committee legal counsel to

6　emulate the role of a court-appointed examiner for the purpose of obtaining further explanation

7　from Obsidian and Mr. Padrick concerning the events leading to the terms of the Cascadia's

8　proposed plan, which included proposed investment by an affiliate of Obsidian.

9　　　　The interview was in depth and extensive.  Based on the interview, the

10　Committee is satisfied that Obsidian did not enter into its engagement as financial advisor to

11　Cascadia for the purpose of attempting to secure an opportunity to invest in The Cascadia

12　Project.  Obsidian developed the extensive, complex modeling that was necessary to secure the

13　interest of the private equity market prior to reaching out to TPG, the proposed equity investor.

14　With Obsidian's support and encouragement, Mr. Kuo, for Cascadia, invested substantial time

15　and effort to obtain new investment from his personal contacts, particularly in the Far East, on

16　his own terms such that he might be able to retain his ownership interest and/or management

17　authority over Cascadia.  In furtherance of these efforts, Mr. Kuo made two extended trips to

18　the Far East after the Petition Date, meeting with a number of investors.  Obsidian also

19　contacted numerous potential equity investors that had contacted Cascadia and/or Obsidian and

20　expressed interest in investing.  Further, after Yarrow Bay agreed to become a strategic

21　investor, Obsidian assisted Yarrow Bay in meeting with financial investors identified by

22　Yarrow Bay.  When all of the foregoing efforts were not successful, Obsidian made its last and

23　best efforts to obtain capital to reorganize Cascadia in a plan that would pay HomeStreet and

24　other creditors, by contacting equity sources it had worked with in the past.  Approximately

25　two weeks before the Letter of Intent was executed, TPG, which had worked with Mr. Padrick

26　in the past, and having the advantage of the modeling and due diligence already performed by

DISCLOSURE STATEMENT IN SUPPORT OF SECOND AMENDED PLAN OF
REORGANIZATION PROPOSED BY THE CASCADIA PROJECT LLC - 18

**MILLER NASH** LLP
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON  98101-2352

SEADOCS:420153.12
552640.0004

1    Obsidian, indicated that it might be prepared to execute a letter of intent after completion of

2    additional internal due diligence, but only if Obsidian could invest in the reorganization and

3    play a post-confirmation management role. Mr. Padrick made prompt disclosure to counsel for

4    Cascadia and counsel for the Committee. Subsequently, on May 28, 2010, the Letter of Intent

5    was executed. Absent Obsidian's contemplated investment and its contemplated

6    post-confirmation role in management of the reorganized Cascadia, TPG would not have

7    executed the Letter of Intent, and no plan would have been feasible.

8           The Committee, having concluded its investigation, is satisfied that the conduct

9    and activities of Mr. Padrick and Obsidian, as of the date of this disclosure statement, have

10   been appropriate and have been designed to serve the best interests of the creditors of this

11   estate.

12       **D.    CASCADIA'S ASSETS**

13           Cascadia's schedules show the following principal assets:

14   •    The Project, with a scheduled value of $76.24 million based upon an appraisal

15        obtained by HomeStreet. Based upon discussions with potential investors,

16        Cascadia believes that the actual value of HomeStreet's collateral, if the Bank

17        foreclosed its interests and promptly sold the project would be not more than

18        $35 million.

19   •    The 50-percent membership in CRC, which has a scheduled value of

20        $9.275 million and a realizable value that is likely to be much less because the

21        value of the interest in CRC is based upon the success of the Project, as a result of

22        which Cascadia would bring power, water, wastewater, and other services utility

23        services to CRC.

24   •    Two bank accounts (now with Commerce Bank) containing approximately

25        $350,000 total, representing cash performance and restoration bonds as to which

26        the obligations have expired.

DISCLOSURE STATEMENT IN SUPPORT OF SECOND AMENDED PLAN OF
REORGANIZATION PROPOSED BY THE CASCADIA PROJECT LLC - 19

**MILLER NASH LLP**
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON 98101-2352

SEADOCS:420153.12
552640.0004

- The unpaid portion of land purchase obligation from Orting School District for purchase of land for School #9 in the amount of $2.7 million.

- Other miscellaneous assets with little or no realizable value.

In addition to scheduled assets, Cascadia has claims against Michels Directional Crossing based on a failed tunnel bore, and claims against Centex based on misrepresentation and or fraud in connection with a document concerning an earnest money deposit.

Cascadia is not aware of any avoidance claims it might assert under Chapter 5. The only possible avoidance claim as to the granting of a security interest to Y.K. Chen for the granting of a security interest in Cascadia's 50 percent membership interest in CRC, which secured prior and future advances, was not pursued within the time set by the Court.

### E.    CASCADIA'S LIABILITIES

A creditor can have an Allowed Claim if it timely files a proof of claim or if Cascadia listed the creditor's claim in Cascadia's schedules and did not list is as disputed, contingent, or unliquidated.  The last day to file timely claims in this case was March 1, 2010. According to Cascadia's schedules, Cascadia had the following liabilities on the Petition Date:

| | |
|---|---|
| Secured creditors, including HomeStreet Bank and the City of Tacoma | $75,284,779[1] |
| Wage claims | $0 |
| Unsecured creditors, but not including the claim of Cascadia Land, LLC or Pulte Homes | $2,191,465 |
| Priority taxes (Pierce County taxes estimated and subject to upward adjustment if certain taxes are determined to be prepetition claims) | $40,307 |

[1] Cascadia has not found a basis for asserting that the documentation of HomeStreet's claim is flawed or avoidable and does not believe that the documentation merits further investigation, although the value of the property securing the HomeStreet claim and the amount of the HomeStreet claim have yet to be determined.

**MILLER NASH** LLP
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON  98101-2352

1             In addition to the foregoing, Cascadia's bankruptcy estate is responsible for

2    allowed administrative-expense claims, which will include any allowed compensation and

3    expenses of professionals retained by Cascadia and the Committee, certain unpaid real property

4    taxes incurred after the Petition Date, and the secured administrative-priority loan claim of

5    Mr. Chen.

## IV.      DESCRIPTION OF PLAN OF REORGANIZATION

### A.      CASH-FLOW PROJECTION

8             With the assistance of its advisors and YB, Cascadia has completed projections

9    for the Project over the full life of the Project, anticipated to be 25 years.  Cascadia has attached

10    the projections hereto, marked as Exhibit C.  Consistent with the expectation of most private

11    equity funds and as discussed below, TPG expects an earlier exit, when Cascadia will pay

12    HomeStreet in full.

13             Cascadia bases the cash flows reflected in the projection upon numerous

14    assumptions about revenue and expenses.  The cash flow section reflects the summary of the

15    projections.  The most important assumptions relate to residential lot price, appreciation of lot

16    values, absorption (rate of lot sales), and estimates of costs related to creating finished lots.

17    Other important assumptions are retail, commercial and industrial acreage values and timing of

18    sale of those parcels.

19             YB has considerable experience in development of residential master plan

20    communities and home building and provided significant assistance in testing market

21    assumptions.  More importantly, YB is investing $4.4 million as equity, which adds an

22    important level of market acceptance of the projections.  YB has been doing due diligence on

23    Cascadia and current market conditions for many months.

24             Cascadia derived the projected residential lot price data by using a residual lot

25    value analysis.  YB completed its own residual lot value analysis, and Obsidian contacted

26    another respected builder, built its own residual lot analysis, and confirmed the validity of YB's

DISCLOSURE STATEMENT IN SUPPORT OF SECOND AMENDED PLAN OF
REORGANIZATION PROPOSED BY THE CASCADIA PROJECT LLC - 21

**MILLER NASH LLP**
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON  98101-2352

SEADOCS:420153.12
552640.0004

1   analysis.  In essence, a residual lot value analysis starts with the anticipated price of an average

2   new home in the price range expected to sell in Cascadia.  The home price used by YB was

3   $275,000, and the home price used by Obsidian was $300,000.  After subtracting all expenses

4   of construction and sale, the residual becomes the "residual lot value."  It is important to note

5   that this analysis assumes builders will build under this model for a specified percentage of the

6   ultimate sale price of the home.  YB and the builder contacted by Obsidian are both prepared to

7   enter into such agreements.  YB is also aware of other builders willing to enter into such

8   agreements.  Builders are available on such basis because of a financing anomaly that exists in

9   the marketplace.  Lenders provide homebuyers financing for completed homes, but builders are

10  finding it extremely difficult to find financing to buy lots and build homes.  The projections

11  therefore assume that the developer is paying the builders and the developer is taking the risk of

12  the sale of the home.  At some point, builders will be able to obtain financing and such a model

13  may no longer be necessary; however, under the projections, the new investors will make

14  available more than $5 million of new equity for this program.

15          Appreciation is a function of supply and demand and macro market conditions.

16  It is anticipated that as the economy recovers, more home buyers will enter the market, but

17  more importantly there is anticipated to be a shortage of supply (at the margin) that is

18  anticipated to increase new home prices.  This shortage will develop because of the significant

19  lead time to develop new lots and the lack of current development activity.  Over the long term,

20  Cascadia anticipates that appreciation will track historical average appreciation for the

21  Seattle/Tacoma area.  Note that the urban growth boundary statute in Washington State

22  concentrates development and results in appreciation that exceeds inflation.

23          Absorption is a function of market demand for the type of product being sold.

24  Because Cascadia is so large, it will be able to create different residential products and take

25  advantage of appealing to different demographics.  Essentially, this will allow Cascadia to

26  create demand that would be similar to multiple projects.  Absorption is also a function of

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON  98101-2352

SEADOCS:420153.12
552640.0004

1  supply.  Historically, the Seattle/Tacoma area has had multiple planned communities being

2  developed; however, most of those communities are fully built out.  Finally, properly marketed

3  with sufficient capital backing the Project, Cascadia can create a "sense of place" that will

4  attract buyers.

5  Costs are a function of current market conditions and historical costs.  The costs

6  were projected using two methods and both produced similar results.

7  The retail, commercial, and industrial component of Cascadia was priced using

8  values that are on average about one-half of that being realized in the industrial corridor in the

9  valley to the northwest of Cascadia.  Further, the projections assume that Cascadia will not sell

10  those parcels for a considerable period to allow development of residences in Cascadia.

11  As stated above, Cascadia anticipates that it will either sell parcels ready for

12  development and/or obtain new equity in seven to nine years.  This will allow TPG to exit

13  should it desire to do so.  The model used discount rates for future cash flows up to a 50-

14  percent internal rate of return and still produced sufficient cash flows to repay HomeStreet and

15  provide a return to Holdings.  Cascadia believes that a proven project should be discounted at a

16  20-percent internal rate of return, which will allow TPG to realize its anticipated returns, but

17  the substantially higher discount rate still pays all obligations of Cascadia in full.

18  **B.    TREATMENT OF UNCLASSIFIED CLAIMS**

19  The Bankruptcy Code requires that the plan treat certain claims, but not others,

20  in classes.  Administrative-expense claims and priority-tax claims are not classified.

21  1.    <u>Administrative expenses</u>

22  Administrative expenses include the actual and necessary expenses of

23  preserving the estate and operating Cascadia's business during the bankruptcy case, obligations

24  Cascadia incurred during the case, compensation, and expense reimbursement for the

25  professionals for Cascadia and the Committee, and statutory fees due to the United States

26  trustee.

**MILLER NASH LLP**
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON  98101-2352

1              Mr. Chen's secured administrative-priority loan is an administrative expense.

2   On October 1, 2009, the court entered an order setting March 1, 2010, as the deadline for

3   Cascadia and the Committee to bring any avoidance action against or to contest the amount,

4   validity, and/or priority of Mr. Chen's lien [Dkt. #84], and neither Cascadia nor the Committee

5   challenged his lien.

6              Cascadia will pay the administrative claims of professionals for Cascadia and

7   the Committee at the later of the Effective Date or the entry of an order of the court approving

8   the expense. Cascadia will pay the secured administrative-priority claim of Chen in full, with

9   interest, on the Effective Date.

10              2.    Priority-tax claims

11              A priority tax claim is a claim of a governmental unit entitled to priority under

12   Bankruptcy Code § 507(a)(8). (Unless indicated otherwise, subsequent references herein to

13   § are to sections of the Bankruptcy Code.) Cascadia estimates that priority-tax claims total

14   approximately $40,307, subject to possible upward adjustment depending on whether certain

15   Pierce County real property taxes are prepetition claims rather than post petition expenses of

16   administration. Cascadia will pay priority-tax claims in full, with interest at 5 percent per

17   annum from the Effective Date, within 60 days after the Effective Date.

18   **C.    ESTATE CLAIMS**

19              Cascadia reserves and does not waive its claims against others, including claims

20   for damages resulting from HomeStreet's attorney's June 11, 2010, letter to Cascadia's attorneys

21   and avoidance and recovery claims under Bankruptcy Code chapter 5, and its defenses to

22   others' claims.

23   ///

24   ///

25   ///

26   ///

DISCLOSURE STATEMENT IN SUPPORT OF SECOND AMENDED PLAN OF
REORGANIZATION PROPOSED BY THE CASCADIA PROJECT LLC - 24

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON 98101-2352

SEADOCS:420153.12
552640.0004

**D.    CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS**

The following summary of the plan's treatment of claims highlights the most important economic elements of the treatment, but does not state all elements of the treatment.

### 1.    Convenience Unsecured Claims.

Cascadia will pay Class 1 Claims – Unsecured Claims of $10,000 or less and Unsecured Claims of more than $10,000 the holders of which elect to reduce their Claims to $10,000 – in full, without interest, by the 30th day after the Effective Date.

### 2.    Unsecured Claims.

Cascadia will pay Class 2 Claims – Unsecured Claims other than those in Class 1 or that of Cascadia Land, LLC – their ratable shares of $2,131,929 in 20 equal quarterly payments without interest.

### 3.    HomeStreet.

HomeStreet holds the Class 3 Claim of approximately $74,166,779.  Class 3 consists of HomeStreet's secured claim (the value of its collateral, less the amount of Cascadia's postpetition payments to HomeStreet) and its unsecured claim (the difference between the amount of its claim and the amount of the secured claim).  Cascadia believes the value of the land securing HomeStreet's claim is approximately $55 million.   Cascadia will treat HomeStreet's claim as described in Part IV.D.3.a below, "HomeStreet General Treatment," and Cascadia will also give HomeStreet the additional treatment in one of Options 1 through 3 set forth below; Option 1 is the default option if HomeStreet does not elect an option.  Exhibit D sets out payments to HomeStreet under each option.

#### a.    HomeStreet General Treatment

By the 10th day after the court closes this case, Cascadia will pay HomeStreet the amount of Cascadia's deposits at Commerce Bank, approximately $350,000.

New bank documents would evidence HomeStreet's claim.  HomeStreet would have a lien on, among other things, residential and commercial structures and other

**MILLER NASH** LLP
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON  98101-2352

1 improvements on its real property collateral. Real and personal property that Cascadia sells,

2 leases, or otherwise transfers at arm's-length in the ordinary course of business or to the extent

3 required to develop the Project, including property transfer necessary to permit Cascadia to

4 grant any easement, temporary use right, or permanent public dedication necessary or

5 appropriate to complete improvements or when required by public agencies in connection with

6 the Project.

7 Before Cascadia could make any distribution to its member-owners, Cascadia

8 must certify to HomeStreet that, after giving effect to the distribution, Cascadia would retain

9 assets worth 110 percent of the amount required by RCW 25.15.235 and provide to HomeStreet

10 an appraisal of Cascadia's assets. RCW 25.15.235 is a Washington state statute that prohibits a

11 limited liability company, such as Cascadia, to make distributions that would render it

12 insolvent. The plan permits HomeStreet to contest Cascadia's certificate by binding arbitration.

13 Until Cascadia has otherwise made all payments the plan requires it to make to

14 Class 2 and Class 3, Cascadia will pay any amount otherwise payable under the waterfall

15 provision of the Letter of Intent to OFG by Cascadia or the servicing entity described in the

16 Letter of Intent, excluding amounts payable to OFG from the base servicing fee or for

17 reimbursement of costs, first to HomeStreet for application to the Class 3 Allowed Secured

18 Claim until paid in full, second to the Class 3 Allowed Unsecured Claim until paid in full and

19 third to holders of Class 2 Claims until paid in full (the "OFG Redirection Payments"). The

20 OFG Redirection Payments will subrogate OFG first to the Class 3 Allowed Secured Claim and

21 then to the Class 2 Claims to the extent of the OFG Redirection Payments. Cascadia will pay

22 OFG its subrogation claim in the same manner Cascadia would have paid the Class 3 Allowed

23 Secured Claim and the Class 2 Claims but for the OFG Redirection Payments. OFG's

24 subrogation claim arising from the OFG Redirection Payments will have priority over all other

25 subrogation claims.

26

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON  98101-2352

1       The plan provides three options to HomeStreet.  An analysis of each of the three

2  options follows, showing the predicted cash flow to HomeStreet under each option.

3        b.    <u>HomeStreet Option 1</u>

4       This Part IV.D.3.b sets forth the additional treatment Cascadia would give

5  HomeStreet if HomeStreet elects Option 1 or makes no option election.

6       By the 10th day after the court closes this case, Holdings would pledge to

7  HomeStreet a deposit account at another financial institution or other liquid assets worth

8  $15 million (the "Road Reserve") as additional collateral that HomeStreet may apply to its

9  Claim if HomeStreet becomes entitled to exercise its default remedies under the new bank

10  documents as defined in the plan.  Within a commercially reasonable and practicable time after

11  the Effective Date, Cascadia may obtain a bond or otherwise secure completion of the 198th

12  Street access corridor improvements pursuant to the Agreement Between Pierce County and

13  Cascadia Development Corporation with the Implementation of Mitigation of Traffic Impacts

14  from Phase 1 of the Cascadia Employment Based Planned Community by the Construction of

15  Improvements Along the 198th Avenue E. Corridor, Recorded with the Pierce County Auditor

16  by August 1, 2005, under Recording No. 200508010610 or any lesser 198th Street access

17  corridor improvements that Pierce County may require (the "Road Improvements").  Cascadia

18  may use funds in the Road Reserve to pay for the Road Improvements or to secure the bond or

19  other security for the Road Improvements, and if permitted by any surety and Pierce County,

20  HomeStreet would have a lien on Road Reserve funds used to secure the bond or other security

21  for the Road Improvements.  HomeStreet's lien on any unused Road Reserve funds would

22  terminate upon completion of the Road Improvements.

23       If HomeStreet elects to have its entire claim treated as a secured claim under

24  § 1111(b) and elects Option 1 or does not elect an option, then (1) the Bankruptcy Code

25  § 1111(b) election would not affect the plan's definition of "Class 3 Allowed Secured Claim";

26  and (2) by the first day of the 84th month that begins after the Effective Date, Cascadia would

DISCLOSURE STATEMENT IN SUPPORT OF SECOND AMENDED PLAN OF
REORGANIZATION PROPOSED BY THE CASCADIA PROJECT LLC - 27

**MILLER NASH LLP**
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON  98101-2352

SEADOCS:420153.12
552640.0004

1   pay HomeStreet the greater of (a) any unpaid amount of the Class 3 Allowed Secured Claim,

2   with interest from the Effective Date at the Prime Rate plus 2 percent per annum (i.e., 200 basis

3   points), and (b) any amount by which the sum of the Class 3 Allowed Secured Claim and the

4   Class 3 Allowed Unsecured Claim as of the Effective Date exceeds the aggregate amount of all

5   payments by or on behalf of Cascadia to HomeStreet from and after the Effective Date.

6         If HomeStreet does not timely and properly make an election under Bankruptcy

7   Code § 1111(b), and HomeStreet elects Option 1 or does not elect an option, then (1) by the

8   first day of the first month that begins after the Effective Date and by the first day of each

9   month thereafter through the 83rd month that begins after the Effective Date, Cascadia would

10   pay HomeStreet an amount determined by amortizing the Class 3 Allowed Secured Claim with

11   interest at the Prime Rate plus 2 percent per annum (i.e., 200 basis points) and 1/300th of the

12   Class 3 Allowed Unsecured Claim, and (2) Cascadia would pay the balances of both claims by

13   first day of the 84th month that begins after the Effective Date.

14       c.    HomeStreet Option 2

15         This Part IV.D.3.c sets forth the additional treatment Cascadia would give

16   HomeStreet if HomeStreet elects Option 2. Under Option 2, Class 3 consists of the secured

17   claim. The plan treats the unsecured claim in Class 2.

18         By the first day of the first month that begins after the Effective Date and by the

19   first day of each month thereafter through the 83rd month that begins after the Effective Date,

20   Cascadia would pay HomeStreet an amount determined by amortizing the Class 3 Allowed

21   Secured Claim over 25 years with interest at the Prime Rate plus 2 percent per annum (i.e., 200

22   basis points). On the first day of the 84th month that begins after the Effective Date, Cascadia

23   would pay HomeStreet the balance of the Class 3 Allowed Secured Claim with interest.

24         At the end of the ninth year after the Effective Date, Cascadia would pay

25   HomeStreet the balance of the secured claim with interest.

26

DISCLOSURE STATEMENT IN SUPPORT OF SECOND AMENDED PLAN OF
REORGANIZATION PROPOSED BY THE CASCADIA PROJECT LLC - 28

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON 98101-2352

SEADOCS:420153.12
552640.0004

1          By the 10th day after the court closes this case, Holdings would pledge to

2 HomeStreet the Road Reserve as additional collateral that HomeStreet may apply to its Claim if

3 HomeStreet becomes entitled to exercise its default remedies under the new bank documents.

4 Within a commercially reasonable and practicable time after the Effective Date, Cascadia may

5 obtain a bond or otherwise secure completion of the Road Improvements. Cascadia may use

6 funds in the Road Reserve to pay for the Road Improvements or to secure the bond or other

7 security for the Road Improvements, and if permitted by any surety and Pierce County,

8 HomeStreet would have a lien on Road Reserve funds used to secure the bond or other security

9 for the Road Improvements. HomeStreet's lien on any unused Road Reserve funds would

10 terminate upon completion of the Road Improvements.

11        d.      HomeStreet Option 3

12          This Part IV.D.3.d sets forth the additional treatment Cascadia would give

13 HomeStreet if HomeStreet elects Option 3. Under Option 3, as under Option 1, Class 3

14 consists of both the secured and unsecured claims. HomeStreet would have no Class 2 Claim.

15 HomeStreet may elect Option 3 only if it timely votes to accept the plan, does not file an

16 objection to plan confirmation, and does not appeal the order confirming the plan. Cascadia

17 would release all claims against HomeStreet, its officers, directors, attorneys, and other agents

18 arising on or before the Effective Date in connection with HomeStreet's prepetition loans to

19 Cascadia or this case, including claims for damages resulting from HomeStreet's attorney's

20 June 11, 2010, letter to Cascadia's attorneys. ***ALSO, HOMESTREET MUST AGREE TO***

21 ***RELEASE ALL GUARANTIES OF ITS LOANS TO CASCADIA.***

22          By the 10th day after the court closes this case, Holdings would pay HomeStreet

23 $10 million for application to reduce the Class 3 Allowed Secured Claim, and Holdings would

24 pledge to HomeStreet a deposit account at another financial institution or other liquid assets

25 worth $4 million (the "Additional Collateral") as additional collateral that HomeStreet may

26 apply to its Claim if HomeStreet becomes entitled to exercise its default remedies as provided

**MILLER NASH LLP**
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON 98101-2352

in the new bank documents. HomeStreet's lien in the Additional Collateral would expire on the first Business Day of the first month that begins 36 months after the Effective Date. After Cascadia makes the $10 million payment, it would base the interest-only payments through the 60th month beginning after the Effective Date on the reduced principal balance of the Class 3 Allowed Secured Claim.

On the first day of the first month that begins after the Effective Date and by the first day of each month thereafter through the 60th month beginning after the Effective Date, Cascadia would pay HomeStreet interest only that has accrued after the Effective Date on the balance of the Class 3 Allowed Secured Claim at the Prime Rate as of the Effective Date plus 2 percent per annum (i.e., 200 basis points). On the first day of the 61st month that begins after the Effective Date and by the first day of each month thereafter through the 107th month that begins after the Effective Date, Cascadia will pay HomeStreet an amount to be determined by amortizing over 20 years the Class 3 Allowed Secured Claim, with interest at the Prime rate plus 2 percent per annum (i.e., 200 basis points). Cascadia will make a balloon payment of the balance of the Class 3 Allowed Secured Claim by the first date of the 108th month that begins after the Effective date.

On the first day of the 61st month that begins after the Effective Date and by the first day of each month thereafter through the 107th month that begins after the Effective Date, Cascadia would pay HomeStreet 1/240th of the amount of the Class 3 Allowed Unsecured Claim. Cascadia would pay the balance of the Class 3 Claims (with any interest that has accrued and remains unpaid on the Class 3 Allowed Secured Claim but with no interest on the Class 3 Allowed Unsecured Claim) by the first day of the 108th month that begins after the Effective Date.

Cascadia would transfer to Holdings, free and clear of all liens, ownership of parcels K1, K2, L, L1, M1, and M5 of the Project (the "Existing Lots") and Cascadia's membership in Cascadia Resort Communities LLC, and any other rights and interest needed to

DISCLOSURE STATEMENT IN SUPPORT OF SECOND AMENDED PLAN OF REORGANIZATION PROPOSED BY THE CASCADIA PROJECT LLC - 30

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON 98101-2352

SEADOCS:420153.12
552640.0004

1  access, hold, develop, sell, use, and provide sewer and water service for the Existing Lots and

2  the land owned by Cascadia Resort Communities LLC.

3          4.    <u>City of Tacoma</u>

4          Class 4 consists both of the City of Tacoma's secured claim (the "Class 4A

5  Claim") evidenced by a water development agreement (the "First Agreement") and its

6  Unsecured claim under three other agreements (the "Class 4B Claim"); the plan specifically

7  describes the agreements.  The plan modifies the First Agreement by extending two deadlines

8  by one year.  The plan otherwise provides for payment of the Class 4A Claim in accordance

9  with the First Agreement and for payment of the Class 4B Claim ($85,722.84) by the 60th day

10  after the Effective Date.

11          5.    <u>Mr. Kuo's subordination claim</u>

12          Class 5 consists of Mr. Kuo's $1 million subordination Secured Claim based on

13  his payment of that amount to HomeStreet.  Cascadia will pay that amount – after paying

14  HomeStreet's Class 3 Claim in full and OFG's subrogation claim in full, but before paying any

15  subrogation claim other than the subrogation claim of OFG.

16          6.    <u>Mr. Kuo's membership interest</u>

17          The plan will cancel Mr. Kuo's membership interest in Cascadia, and Holdings

18  will become the new sole member in Cascadia.

19          7.    <u>Cascadia Land, LLC</u>

20          Cascadia Land, LLC, also referred to in the plan as the Cascadia Land, LLC,,

21  will receive the lesser of $16.2 million or the amount Cascadia Land, LLC, has invested in

22  Cascadia or its predecessors before the Filing Date, without interest or any other return, in

23  either case less any cash received by Cascadia Land, LLC, from Cascadia or its predecessors,

24  with payments made after plan payments to HomeStreet and certain defined plan payments

25  have been completed, and after the payment of the Kuo subrogation claim.

26

**MILLER NASH LLP**
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON  98101-2352

E.   **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Cascadia will file a list of executory contracts and leases Cascadia will assume, with cure amounts, as a supplement to the plan before the hearing on approval of this disclosure statement. *A PARTY TO AN EXECUTORY CONTRACT MUST FILE PROOF OF ANY CLAIM BASED ON THE REJECTION OF AN EXECUTORY CONTRACT NO LATER THAN 30 DAYS AFTER THE SOONER OF ENTRY OF THE ORDER APPROVING REJECTION OF THE CONTRACT OR LEASE OR 30 DAYS AFTER THE EFFECTIVE DATE.*

F.   **CONFIRMATION EFFECT**

1.   Discharge

Confirmation of the plan will discharge Cascadia's pre-Effective Date debts in accordance with Bankruptcy Code § 1141.  Cascadia's plan commitment to pay creditors replaces its discharged prepetition obligations.

2.   Plan alteration, amendment, or modification

Cascadia reserves the right to move to alter, amend, or modify the plan after confirmation and before substantial consummation so long as the alteration, amendment, or modification is not materially adverse to creditors, New Equity, Holdings, or Cascadia.

3.   Jurisdiction

After plan confirmation, the court will retain exclusive jurisdiction over all matters arising out of or relating to the bankruptcy case.

V.   **TAX CONSEQUENCES**

CASCADIA URGES EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT THE HOLDER'S OWN TAX ADVISOR REGARDING THE CONSEQUENCES OF THE PLAN TO THE HOLDER UNDER FEDERAL AND APPLICABLE STATE, LOCAL, AND FOREIGN TAX LAWS.  CASCADIA AND ITS COUNSEL EXPRESS NO OPINION AS TO THE TAX CONSEQUENCES OF THE PLAN OR THE EFFECT

**MILLER NASH LLP**
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON  98101-2352

1     THEREOF ON ANY CREDITOR.  IN PARTICULAR, CASCADIA'S PRE-EFFECTIVE

2     DATE MEMBER SHOULD CONSIDER THE PASS-THROUGH TAX EFFECTS OF

3     CASCADIA'S INCOME IN 2010 AND LATER YEARS BY REASON OF PLAN

4     CONFIRMATION AND TRANSACTIONS CONTEMPLATED BY THE PLAN.

5     **VI.**     **RISKS AND ALTERNATIVES**

6        **A.**     **RISKS**

7           If the court confirms the plan, there is a risk that Cascadia might not meet its

8     financial projections and thus not be able to perform its plan obligations.  For example, if there

9     is a material negative difference between the actual lot absorption rate and the rate included in

10     the model on which Cascadia bases its plan, that could affect Cascadia's ability to perform.

11     There is also the risk that Pierce County does not fund completion of the wastewater treatment

12     plant.

13           Further, there is the risk that the new equity does not provide sufficient funds so

14     that the holding company can complete its anticipated investment in Cascadia.

15           The Limited Liability Company Agreement of Cascadia Resort Communities

16     LLC ("CRC LLC Agreement") gives Sumitomo Forestry Seattle, Inc. ("Sumitomo") certain

17     rights in case of a transfer of any membership interest in CRC.  Sumitomo, through its counsel,

18     has reserved any rights it may have under the CRC LLC Agreement with respect to any

19     involuntary transfer of Cascadia's interest in CRC under the plan.  Because the plan does not

20     effect a transfer of Cascadia's interest in CRC, Cascadia does not believe that the plan will

21     trigger any rights Sumitomo would have under the CRC LLC Agreement based on an

22     involuntary transfer of Cascadia's interest CRC.  If, however, Sumitomo asserted such rights

23     and a court held that an involuntary transfer had occurred, Sumitomo could have the option to

24     deprive Cascadia of voting rights and/or could exercise its call right to purchase Cascadia's

25     CRC interest.

26

DISCLOSURE STATEMENT IN SUPPORT OF SECOND AMENDED PLAN OF
REORGANIZATION PROPOSED BY THE CASCADIA PROJECT LLC - 33

**MILLER NASH** LLP
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON  98101-2352

SEADOCS:420153.12
552640.0004

1　　　　　Cascadia and Sumitomo are also parties to a Development Management

2　Agreement, and Sumitomo might seek to deprive Cascadia of its rights under the development

3　management agreement if the plan is confirmed.

4　　　　**B.**　　**ALTERNATIVES**

5　　　　　If the court does not confirm a plan, any party in interest may attempt to

6　formulate or propose a different plan or plans of reorganization.  Those other plans might

7　involve a reorganization and continuation of Cascadia's business, an orderly liquidation of

8　Cascadia's assets or a combination thereof.  But as stated below, Cascadia believes that the only

9　likely alternative to confirmation of the plan is the granting of HomeStreet Bank's Motion for

10　relief form stay and the foreclosure of the real property remaining with Cascadia.

11　　　　　If the court determines that no plan of reorganization is confirmable, the court

12　may convert the case to a liquidation proceeding under Bankruptcy Code chapter 7.  In a

13　liquidation case, the United States trustee would appoint a chapter 7 trustee to liquidate

14　Cascadia's assets.  Typically, in a liquidation case, the trustee sells the assets for less than their

15　going concern value and, accordingly, the return to creditors and interest holders is less than the

16　return in a reorganization.  The trustee would distribute proceeds from liquidation to creditors

17　and interest holders of Cascadia in accordance with Bankruptcy Code priorities.

18　　　　　Cascadia has concluded that if the court does not confirm the proposed plan or if

19　for any other reason the court grants to HomeStreet relief from the automatic stay, HomeStreet

20　will cause a foreclosure of its deeds of trust and only priority tax creditors, the City of Tacoma,

21　and Mr. Y.K Chen would be likely to receive any payments.  Cascadia believes that the holders

22　of impaired claims will receive more under the plan than they would receive in a chapter 7

23　liquidation.  The following chart summarizes Cascadia's expectations regarding the effect of

24　liquidation on unsecured creditors:

25

26

**MILLER NASH** LLP
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON  98101-2352

| Asset | Analysis | Amount Available to Unsecured Creditors |
|---|---|---|
| 4,200 acres of partially developed real property in Pierce County, WA | In a liquidation, Cascadia expects that the Project would be subject to foreclosure by the secured lender leaving no payment for creditors except senior lien holders and priority tax claims. | $0 |
| Investment in Cascadia Land, LLC | The value of Cascadia's interest in Cascadia Land LLC is uncertain, but Cascadia does not expect the value to be greater than the lien on it by the DIP lender, administrative expenses, and other claims against the LLC interest. | $0 |
| Other Assets | Other assets listed by Cascadia have been determined to have no or an uncertain value. Cascadia expects amounts receivable from the prior sale of land to be claimed by the secured lender or other senior lien holders. | $0 |
| Bond Proceeds | Certain bond proceeds are the subject of litigation asserting a secured claim against them. If the secured creditor prevails, the bond proceeds will be used to pay the secured claim. | $0 |
| Total Proceeds from Liquidation Available to Unsecured Creditors | | |

*[The rest of this page intentionally left blank.]*

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON 98101-2352

1   **VII.   CONCLUSION**

2          Please read this disclosure statement and the plan carefully.  After reviewing all

3   of the information and making an informed decision, please vote by using the enclosed ballot.

4          DATED this 2nd day of July, 2010.

5                         MILLER NASH LLP

6

7                         _/s/ Geoffrey Groshong_
                          Geoffrey Groshong
8                         WSB No. 6124
                          David W. Hercher
9                         WSB No. 21946

10                         Attorney for The Cascadia Project LLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DISCLOSURE STATEMENT IN SUPPORT OF SECOND AMENDED PLAN OF
REORGANIZATION PROPOSED BY THE CASCADIA PROJECT LLC - 36

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WASHINGTON  98101-2352

SEADOCS:420153.12
552640.0004